UNITED STATES DISTRICT COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM, on Behalf of Itself and All Others Similarly Situated | ) ) ) | No. |
| | ) | CLASS ACTION COMPLAINT FOR VIOLATIONS OF FEDERAL SECURITIES LAWS |
| Plaintiff, | ) ) | |
| vs. | ) ) | |
| THE PRINCETON REVIEW, INC., MICHAEL PERIK, STEPHEN C. RICHARDS, SUSAN RAO, DAVID LOWENSTEIN, JEFFREY R. CRISAN, ROBERT E. EVANSON, CHRISTIAN G. KASPER, RICHARD KATZMAN, MICHAEL A. KRUPKA, LINDA WHITLOCK, and ROTH CAPITAL PARTNERS, LLC, | ) ) ) ) ) ) ) ) ) ) ) | DEMAND FOR JURY TRIAL |
| Defendants. | ) ) | |

Plaintiff Washtenaw County Employees' Retirement System ("Washtenaw County" or "Plaintiff") makes the following allegations, except as to allegations specifically pertaining to Plaintiff and Plaintiff's counsel, based upon the investigation undertaken by Plaintiff's counsel, which included a review of United States Securities and Exchange Commission ("SEC") filings and analysis of publicly available news articles and reports, public filings, securities analysts' reports and advisories about The Princeton Review, Inc. ("Princeton Review" or the "Company"), press releases and other public statements issued by the Company, and media reports about the Company and believes that substantial additional evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1.      This is a federal securities class action on behalf of a class consisting of all persons or entities, other than Defendants, who acquired the common stock of Princeton Review in or traceable to the Company's offering of securities on or about April 15, 2010 (the "Offering"), as well as purchasers of the Company's common stock between March 12, 2009 and March 11, 2011, inclusive (the "Class Period"), under Sections 11, 12(a)(2) and 15 of the Securities Act of 1933 ("Securities Act") and Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 ("Exchange Act"), as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA") and Rule 10b-5 promulgated thereunder (17 C.F.R. §240.10b-5).

## JURISDICTION AND VENUE

2.      The claims asserted herein arise under and pursuant to Sections 11, 12(a)(2) and 15 of the Securities Act [15 U.S.C. §§77k, 77l(a)(2) and 77o] and Sections 10(b) and 20(a) of the Exchange Act [15 U.S.C. §§78j(b) and 78t(a)] and Rule 10b-5 promulgated thereunder [17 C.F.R. §240.10b-5].

3.     This Court has jurisdiction over this action pursuant to Section 22 of the Securities Act [15 U.S.C. §77v], Section 27 of the Exchange Act [15 U.S.C. §78aa], and 28 U.S.C. §§1331 and 1337.

4.     Venue is properly laid in this District pursuant to Section 22 of the Securities Act, Section 27 of the Exchange Act and 28 U.S.C. §1391(b) and (c).  The acts and conduct complained of herein occurred in substantial part in this District and the Company's executive offices are located in this District.

5.     In connection with the acts and conduct alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including the mails and telephonic communications and the facilities of the national securities markets.

## PARTIES

6.     Plaintiff Washtenaw County acquired the common stock of Princeton Review as set forth in the certification attached hereto and incorporated by reference herein during the Class Period and pursuant or traceable to the Offering and was damaged thereby.

7.     Defendant Princeton Review maintains its executive office in Framingham, MA and provides integrated classroom-based, print, and online products and services to the high school and post-secondary markets in the United States and internationally.

8.     Defendant Michael Perik ("Perik") served as President, Chief Executive Officer ("CEO"), and a director of Princeton Review from July 2007 until his resignation on March 8, 2011.

9.     Defendant Stephen C. Richards ("Richards") served as Chief Operating Officer ("COO") and Chief Financial Officer ("CFO") of Princeton Review from January 2008 until his resignation during June 2010.  Defendant Richards joined the Company in November 2007.

- 2 -

10.     Defendant Susan Rao ("Rao") joined Princeton Review in September 2007 as Executive Vice President, Finance and served as Executive Vice President, Finance and Treasurer of Princeton Review from January 2008 until her resignation on December 31, 2009.

11.     Defendant David Lowenstein ("Lowenstein") served as a director of Princeton Review since May 2007 and as Chairman of the Board of Directors of the Company since September 2008.

12.     Defendant Jeffrey R. Crisan ("Crisan") served as a director of the Company since July 2007.

13.     Defendant Robert E. Evanson ("Evanson") served as a director of the Company since June 2005.

14.     Defendant Christian G. Kasper ("Kasper") served as Executive VP, Treasurer, and CFO of the Company since replacing Defendant Richards in August 2010.

15.     Defendant Richard Katzman ("Katzman") served as a director of the Company since 1985.  Defendant Katzman sold more than 10,000 shares of Company stock during the Class Period for $38,000.  Defendants Katzman is the brother of John Katzman, the founder of Princeton Review. John Katzman sold almost 3 million shares of Company stock for more than $10.8 million during the Class Period.

16.     Defendant Michael A. Krupka ("Krupka") served as a director of the Company since July 2007.

17.     Defendant Linda Whitlock ("Whitlock") served as a director of the Company since April 2009.

18.     Defendants Perik, Richards, Rao, Lowenstein, Crisan, Evanson, Katzman, Kasper, Krupka, and Whitlock above are collectively referred to herein as the "Individual Defendants."

19.     Defendants Perik, Richards, Rao, Lowenstein, Crisan, Evanson, Katzman, Krupka, and Whitlock above are collectively referred to herein as the "Offering Individual Defendants." Each of the Offering Individual Defendants signed the Registration Statement issued in connection with the Offering.

20.     Defendant Roth Capital Partners, LLC ("Roth Capital") served as the underwriter for the Offering.  Roth Capital drafted and disseminated the Registration Statement and Prospectus for the Offering.  Roth Capital failed to perform adequate due diligence in connection with its role as underwriter for the Offering and was negligent in failing to ensure that the Registration Statement and Prospectus for the Offering were prepared properly and accurately.  Roth Capital's failure to conduct an adequate due diligence investigation was a substantial factor leading to the harm complained of herein.

21.     Because of the Individual Defendants' positions with the Company, they had access to the adverse undisclosed information about the Company's business, operations, operational trends, financial statements, markets and present and future business prospects via internal corporate documents (including the Company's operating plans, budgets and forecasts and reports of actual operations compared thereto), conversations and connections with other corporate officers and employees, attendance at management and Board of Directors meetings and committees thereof and via reports and other information provided to them in connection therewith.

22.     It is appropriate to treat the Individual Defendants as a group for pleading purposes and to presume that the false, misleading and incomplete information conveyed in the Company's public filings, press releases and other publications as alleged herein are the collective actions of the narrowly defined group of defendants identified above.  Each of the above officers of Princeton Review, by virtue of their high-level positions with the Company, directly participated in the

management of the Company, was directly involved in the day-to-day operations of the Company at the highest levels and was privy to confidential proprietary information concerning the Company and its business, operations, growth, financial statements, and financial condition, as alleged herein. Said defendants were involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein, were aware, or recklessly disregarded, that the false and misleading statements were being issued regarding the Company, and approved or ratified these statements, in violation of the federal securities laws.

23.     As officers and controlling persons of a publicly-held company whose common stock was, and is, registered with the SEC pursuant to the Exchange Act, and was, and is, traded on the Nasdaq National Market ("NASDAQ"), and governed by the provisions of the federal securities laws, the Individual Defendants each had a duty to promptly disseminate accurate and truthful information with respect to the Company's financial condition and performance, growth, operations, financial statements, business, markets, management, earnings and present and future business prospects, and to correct any previously-issued statements that had become materially misleading or untrue, so that the market price of the Company's publicly-traded common stock would be based upon truthful and accurate information. The Individual Defendants' misrepresentations and omissions during the Class Period violated these specific requirements and obligations.

24.     The Individual Defendants participated in the drafting, preparation, and/or approval of the various public and shareholder and investor reports and other communications complained of herein and were aware of, had reason to know of, or recklessly disregarded, the misstatements contained therein and omissions therefrom, and were aware of their materially false and misleading nature. Because of their Board membership and/or executive and managerial positions with Princeton Review, each of the Individual Defendants had access to the adverse undisclosed

information about the Company's business prospects and financial condition and performance as particularized herein and knew (or recklessly disregarded) that these adverse facts rendered the positive representations made by or about Princeton Review and its business issued or adopted by the Company materially false and misleading.

25.     The Individual Defendants, because of their positions of control and authority as officers and/or directors of the Company, were able to and did control the content of the various SEC filings, press releases and other public statements pertaining to the Company during the Class Period.  Each Individual Defendant was provided with copies of the documents alleged herein to be misleading prior to or shortly after their issuance and/or had the ability and/or opportunity to prevent their issuance or cause them to be corrected.  Accordingly, each of the Individual Defendants is responsible for the accuracy of the public reports and releases detailed herein and is therefore primarily liable for the representations contained therein.

## CLASS ACTION ALLEGATIONS

26.     Plaintiff brings this action as a class action pursuant to Federal Rules of Civil Procedure 23(a) and 23(b)(3) on behalf of a class consisting of all persons or entities who acquired the common stock of Princeton Review in or traceable to the Company's Offering on or about April 15, 2010, as well as purchasers of the Company's common stock between March 12, 2009 and March 11, 2011, inclusive (the "Class").  Excluded from the Class are Defendants, members of the immediate family of each of the Defendants, any person, firm, trust, corporation, officer, director or other individual or entity in which any Defendant has a controlling interest or which is related to or affiliated with any Defendant, and the legal representatives, agents, affiliates, heirs, successors-in-interest or assigns of any such excluded party.

27.     The members of the Class are so numerous that joinder of all members is impracticable.  Princeton Review's stock is actively traded on the NASDAQ.  Princeton Review sold

more than 16 million shares in the Offering.  The precise number of Class members is unknown to Plaintiff at this time but is believed to be in the thousands.  In addition, the names and addresses of the Class members can be ascertained from the books and records of Princeton Review or its transfer agent or the underwriters to the Offering.  Notice can be provided to such record owners by a combination of published notice and first-class mail, using techniques and a form of notice similar to those customarily used in class actions arising under the federal securities laws.

28.     Plaintiff will fairly and adequately represent and protect the interests of the members of the Class.  Plaintiff has retained competent counsel experienced in class action litigation under the federal securities laws to further ensure such protection and intends to prosecute this action vigorously.

29.     Plaintiff's claims are typical of the claims of the other members of the Class because Plaintiff's and all the Class members' damages arise from and were caused by the same false and misleading representations and omissions made by or chargeable to Defendants.  Plaintiff does not have any interests antagonistic to, or in conflict with, the Class.

30.     A class action is superior to other available methods for the fair and efficient adjudication of this controversy.  Since the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it virtually impossible for the Class members to seek redress for the wrongful conduct alleged.  Plaintiff knows of no difficulty that will be encountered in the management of this litigation that would preclude its maintenance as a class action.

31.     Common questions of law and fact exist as to all members of the Class and predominate over any questions affecting solely individual members of the Class.  Among the questions of law and fact common to the Class are:

(a)      Whether the federal securities laws were violated by Defendants' acts as alleged herein;

(b)      Whether the Prospectus and Registration Statement issued by Defendants to the investing public in connection with the Offering negligently omitted and/or misrepresented material facts about Princeton Review and its business;

(c)      Whether statements made by Defendants to the investing public during the Class Period misrepresented material facts about the business and operations of the Company; and

(d)      The extent of injuries sustained by members of the Class and the appropriate measure of damages.

## SUBSTANTIVE ALLEGATIONS

32.      Princeton Review describes itself as providing integrated classroom-based, print and online products and services that address the needs of students, parents, educators and educational institutions.  The Company was founded in 1981 as an SAT preparation course.

33.      By 2007, the Company's business was performing poorly.  On July 24, 2007, the Company announced that private investors Bain Capital Ventures and Prides Capital purchased $60 million of preferred stock in the Company.  Also on that date, the Company announced that Defendant Perik became its CEO.  In connection with his retention, Defendant Perik received the option to buy 1.7 million shares of the Company's common stock at $4.69 per share that vested quarterly over four years, beginning on October 31, 2007.

34.      Defendant Perik was brought in to restructure and turn-around the Company.  The restructuring plan was to be employed in several phases.  Phase 1 consisted of cost cutting.  By late 2008 and early 2009, the Company was ready to embark on Phase 2, which consisted of growing the business.  Unbeknownst to investors, however, Princeton Review was experiencing significant competitive challenges in the marketplace that frustrated its growth efforts.

35.     The Class Period begins on March 12, 2009.  On that date, after the close of the

market, Princeton Review issued a press release announcing its financial results for the fourth

quarter and full year 2008, the period ending December 31, 2008.  For the full year, the Company

reported that income from continuing operations before taxes was $1.3 million, up from a loss of

$31.4 million for the full year ended December 31, 2007, and that full year revenue increased 25.5%

over 2007 to $138.8 million.  Defendant Perik commented on the results, stating, in pertinent part, as

follows:

> The Princeton Review made significant progress in 2008.  Our financial results and
> key metrics underscore the operational and financial improvements we have made in
> turning around the business.  Importantly, we also assumed greater control over
> brand management and promotion, and streamlined operations as we continue to
> transform and enhance the business.

36.     The press release also provided the Company's sales outlook stating, in pertinent part,

as follows:

> For the full year 2009, the Company expects revenue growth to be between 16% and
> 20% including the full year results from the Company's remaining domestic
> franchises that were acquired in 2008.  The Company also expects earnings before
> interest, taxes, depreciation and amortization (EBITDA) to be between 10% and 13%
> of our revenues in 2009.

37.     On March 12, 2009, Princeton Review held a conference call with analysts and

investors to discuss the earnings announcement and the Company's operations.  During the call,

Defendant Perik spoke positively about the Company's turn-around efforts and stated the following:

> Thanks, Steve.  Eighteen months ago our team was brought in to turn around the
> Princeton Review.  Our first task was to make the operation profitable.  Through a
> combination of cost cutting and a refocus on our core Test Prep business, I believe
> we've turned the corner in 2008.

> The task in 2009 is now to grow the business profitably.  The guidance that Steve
> just gave will even at its low end, essentially double our EBITDA.  We have
> confidence in those goals when we look at the current trajectory of our Test Prep
> business and our SES business, and with the pending sale of K-12 we believe there
> are continued opportunities to reduce, reproduce costs.

I will reemphasize something that I said in my, earlier in my remarks.  I think we are very encouraged by the fact that we (inaudible) about 40% of our retail enrollments to date.  We are very encouraged by the trend right now, which has our enrollments up around 15% and our retail courses albeit at a lower price point which is planned in our business, but we are experiencing organic growth in our retail business right now.

38.    On or about March 16, 2009, Princeton Review filed with the SEC its Annual Report for 2008 on Form 10-K (the "2008 Form 10-K").  The 2008 Form 10-K reiterated the financial results reported in the Company's March 12, 2009 press release.  The 2008 Form 10-K also discussed the Company's restructuring efforts, stating, in pertinent part, as follows:

**Restructuring**

In 2007, we initiated a restructuring effort which resulted in restructuring expenses of $8.9 million and $2.2 million for the years ended December 31, 2007 and 2008, respectively.  The costs incurred related to the relocation of our finance and certain legal operations from New York City to offices located near Boston, Massachusetts, and the consolidation of the remaining New York offices.  The relocation was undertaken in order to improve the financial reporting process and to continue remediation efforts related to material weaknesses we previously reported in our Annual Report on Form 10-K for the fiscal year ended December 31, 2007.

We announced and commenced a restructuring initiative in the first quarter of 2009 related to our decision to outsource our information technology operations, transfer the majority of remaining corporate functions located in New York City to our offices located near Boston, Massachusetts, and simplify our management structure following the sale of the K-12 Services Division.  The Company expects to incur approximately $3.0 million of charges related to these actions consisting of severance benefits for terminated employees and consulting fees related to transition of information technology operations to a third party.  The Company expects to record the majority of these expenses and make related cash payments over the first and second quarters of 2009.

39.    On May 7, 2009, Princeton Review issued a press release announcing its financial results for the first quarter of 2009.  For the quarter, the Company reported that revenues increased 25.5% to $44.8 million as compared to $35.7 million during the same period in 2008, and income from continuing operations before taxes was $2.2 million as compared to $0.3 million during the

same period in 2008.  Defendant Perik commented on the results, stating, in pertinent part, as

follows:

> Our financial performance in the first quarter demonstrates the continuing progress we have made in moving toward our goal of returning The Princeton Review to sustainable profitability.  The positive impact of operational changes made in 2008 are being felt and we are pleased with our revenue and margin performance during this quarter and the reduction of corporate expenses compared to the first quarter of 2008, especially in light of overall economic conditions.

40.     On May 7, 2009, the Company held a conference call with analysts and investors to

discuss the earnings announcement and the Company's operations.  During the call, Defendant Perik

spoke positively about Company's progress and the following exchange took place:

> **Michael Perik** – *Princeton Review – Chairman and CEO*
>
> Thank you, Steve. The Princeton Review's management is pleased with the results of this quarter.  In a challenging economic environment I think we've made substantial progress on the year-over-year basis.  But quarters, of course, only tell you what happened in the past.  I think we are equally pleased when we look forward.  Our enrollment growth is strong, our successful National Testing Day initiative, which I discussed, and our strong institutional pipeline are giving us confidence that 2009 will be the most successful year that the Princeton Review has ever had.
>
> And with that, Steve and I would be happy to take any questions.
>
> *            *            *
>
> **Jason Anderson** – *Stifel Nicolaus – Analyst*
>
> Okay, great.  A thought, too -- in Test Prep, looking into the growth there, you guys, I think you talked about seeing some organic growth this year.  It doesn't appear there was any this quarter.  Is that somewhat of a seasonal thing, or do you still have that view here for '09? Do we expect to see some organic growth?
>
> **Michael Perik** – *Princeton Review – Chairman and CEO*
>
> *            *            *
>
> So I think we are – as I said in my closing remarks, we're quite confident on the back end of the year.  We're at a point now in May where over half of the enrollments for the year have been already booked.  So our visibility starts to get better and better with every week, and I think we like where things are headed right now.

- 11 -

41.     On August 6, 2009, Princeton Review issued a press release announcing its financial results for the second quarter of 2009.  For the six month period ending on June 30, 2009, the Company reported that revenues increased 9.3% to $76.3 million as compared to $69.8 million during the same period in 2008.  Defendant Perik commented on the results, stating, in pertinent part, as follows:

> Our revenue growth for the six months ended June 30, 2009, while positive, has been negatively affected by continuing macro-economic challenges and industry pricing pressures.  ***Despite this our earnings growth reflects the continued effective execution of our strategy.  Both our test prep and supplemental educational services businesses are subject to seasonality and a greater proportion of our first half revenues fell in our first quarter this year as opposed to our second quarter.***[1]
> This was especially true for our SES division.  Our test prep enrollments are up, which we believe is an indicator that consumer awareness of The Princeton Review and our overall brand presence in the marketplace continues to grow.

42.     On August 6, 2009, the Company held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations.  During the call, Defendant Perik spoke positively about Company's progress and stated, in pertinent part, as follows:

> Given where we are at this point in the year, I think I am in a position to be able to give investors a pretty good view of management's belief of where fiscal 2009 is going to end up.  We are now at a point in the year, we have good visibility on where things should be on December 31 and I want to share that perspective with you.

> The Princeton Review's financial performance in 2009 has been driven by three major factors.  The first is year-over-year pricing trends, the second is enrollment trends and the third is the shift between tutoring and retail courses with our customers.

> Ever since the economy turned last summer, we have seen our clients migrate to lower-cost products in our system.  Obviously as prices come down, that's put pressure on margins.  We had said in previous calls that our goal had been to grow enrollments at a rate that would help offset that margin impact.

---

[1] Emphasis added unless otherwise indicated.

Q1 successfully did that, did it because, in that quarter, enrollment growth outpaced the price decline.   Q2 was less successful in mitigating the impact.   We had enrollment growth but at a lesser rate than the average prices fell by.

We expect that the back half of the year will be more successful in that, in this vein. Our confidence in saying that is right now with almost 80% of our annual retail enrollment book, we expect to see the last half of the year as essentially flat in dollars in our retail business, but high single digit enrollment growth.

*          *          *

Now, investors need to remember that there is a lag between when we book a tutoring customer and when we ultimately recognize that revenue.   And that lag can be measured in several months.  *I am able on this call, however, to report that we have seen that shift that started last summer and last fall away from tutoring, start to slow its decline in recent months and, frankly, come very close to flattening out if not turning around in the right direction.   And that is a bullish sign for the balance of the year*.

*Speaking of the balance of the year, the Company is giving guidance today of annual revenue growth between 7 and 10% in a range of EBITDA profitability before restructuring between 10 and 13%.   Such guidance essentially assumes behind it that our test prep business will be essentially flat organically in the back end of the year*.

Now as of today, when we look at our retail bookings in the third and fourth quarters, that is exactly what we are seeing right now.   They are essentially flat.   Our tutoring booking as I mentioned earlier has reversed course recently and then the last few weeks it actually started to trend upwards – particularly in the first part of August.

We think that this is frankly a sign of an improved economy and something that will benefit from.   So, overall, if the business continues to trend as it is trending today, we will end up at a minimum doubling our EBITDA before our restructuring charges that we announced earlier in the year on a year-over-year basis.

*          *          *

43.     On September 24, 2009, Princeton Review filed a registration statement on Form S-3

with the SEC (the "Registration Statement") that authorized the Company, from time to time, to

offer and sell up to $75 million of any combination of preferred stock, common stock, units and

warrants.

- 13 -

44.     On October 19, 2009, Princeton Review announced that it entered into an agreement to acquire all outstanding shares of Penn Foster Education Group, Inc. ("Penn Foster"), one of the oldest and largest online career education companies in the United States, for $170 million in cash.

45.     On November 5, 2009, Princeton Review issued a press release announcing its financial results for the third quarter of 2009.  For the quarter, the Company reported revenue of $34.3 million compared to $34.7 million in 2008 during the same period.  Defendant Perik commented on the results, stating, in pertinent part, as follows:

> Our financial results demonstrate achievement of sustainable profitability, even in the midst of a difficult economy.  Due to the positive impact of earlier cost reductions and the **stable performance of our core Test Prep business**, we are generating positive cash flow.  We are investing in our customer supporting technology, including expansion of our online offerings to extend our market reach, bring products to market more quickly, and meet evolving consumer demand.  In addition, the pending acquisition of Penn Foster gives us entry into the worker retraining market and strengthens our marketing and partnership capabilities.  We expect that these actions will deliver meaningful financial benefit over time.

46.     On November 5, 2009, the Company held a conference call with analysts and investors to discuss the earnings announcement and the Company's operations.  During the call, Defendant Perik spoke positively about the Company's progress and stated, in pertinent part, as follows:

> Thank you, Steve.  Well, I have a few headlines that I hope investors will take away from this call today.  **First, it is that the turnaround has worked.**  The clearest evidence of this is the significant cash flow we have generated this year.  We've used it to pay down our debt, used it to invest in better systems and in new online products.
>
> **Secondly, we are seeing real improvements in the test prep marketplace**.  Remember, the revenue we are reporting today reflects decisions that consumers made last spring.  And in the second quarter, which was a challenging one for us, the revenue we were reporting then were decisions that people had made back in the winter, when the economy was particularly bleak.
>
> Today, consumers are making decisions – buying our tutoring services and our retail businesses – which clearly show us that things have bottomed out.  And in fact, we have had a positive reversal of trend lines.  So the revenue that we book today with

our customers will end up being reported to investors early next year or into the spring of next year. So there's a long lead time between when you get visibility on it and when we get visibility on it.

***A part of this improvement, I think, is driven by economic conditions; but frankly, I think our new strategies are working, both from a product and a marketing perspective, and I think we are gaining market share over our competition.***

\*       \*       \*

47.     On the November 5, 2009 conference call, Defendant Perik responded to a question about the competitive market, in pertinent part, as follows:

Sitting here right now, my enrollment growth outpaces my revenue growth but both of them are in the double-digit area right now for 2010. So we feel that we're in a very good position, both from a pricing point of view and from our market momentum.

48.     On December 8, 2009, Princeton Review announced it had entered into a credit agreement with General Electric Capital Corporation ("GE Capital"), pursuant to which GE Capital agreed to provide the Company with senior secured credit facilities consisting of a five-year $40.0 million senior secured term loan and $10.0 million senior secured revolving credit facility.

49.     On March 11, 2010, Princeton Review issued a press release announcing its financial results for the fourth quarter and full year 2009. For the full year, the Company reported that revenue was $143.5 million, an increase of 3.4% from $138.8 million in 2008. Princeton Review reported a loss from continuing operations before taxes of $13.1 million for the full year 2009 compared to income of $1.3 million in 2008. Defendant Perik commented on the results, stating, in pertinent part, as follows:

We are pleased that the end of 2009 marks the beginning of a new phase of The Princeton Review's transformation. Over the past two and a half years, we have evolved from a test preparation and SES tutoring business to a diversified educational services company with test preparation, post secondary education and career education businesses. Our financial results reflect this transformation and as of January 2010, we have two primary businesses of equal scale, both with strong brand recognition in their respective markets.

- 15 -

50.     The press release also provided a financial outlook for the Company and stated, in pertinent part, as follows:

> For the full year 2010, The Princeton Review expects revenue of approximately $225 million to $235 million, including the full year results from the Penn Foster acquisition and excluding any revenues associated with the anticipated joint venture with the National Labor College.  The Company also expects earnings before interest, taxes, depreciation, amortization, stock based compensation, restructuring and acquisition expenses (Adjusted EBITDA) to be between 12% and 14% of our revenues in 2010, after recording an estimated $8 to $10 million of expenses for start up and organizational costs associated with the National Labor College and community college joint ventures.

51.     On April 15, 2010, the Prospectus and Prospectus Supplement with respect to the Offering (collectively, "Prospectus"), which forms part of the Registration Statement, became effective and 14 million shares of common stock of Princeton Review at $3 per share were sold to the public, thereby raising $42 million.  On or about April 20, 2010, Roth Capital exercised the overallotment option to purchase an additional 2.1 million shares.  In total, 16.10 million shares were sold by the Company in the Offering, thereby raising $48.30 million.

52.     The Registration Statement and Prospectus for the Offering incorporate various documents by reference, including the Company's Annual Report on Form 10-K for the year ended December 31, 2008, filed with the SEC on March 16, 2009; the Company's Quarterly Reports on Form 10-Q for the period ended March 31, 2009, filed with the SEC on May 8, 2009, and for the period ended June 30, 2009, filed with the SEC on August 7, 2009; and the Company's Current Reports on Form 8-K filed with the SEC on March 18, 2009, March 31, 2009 and April 20, 2009, and amended Current Report on Form 8-K/A filed with the SEC on March 30, 2009.  The Registration Statement also failed to disclose the material adverse facts and trends detailed herein.

53.     On May 6, 2010, Princeton Review issued a press release announcing its financial results for the first quarter of 2010.  For the quarter, Princeton Review announced a 41% increase in

revenues to $63.2 million, up from $44.8 million in the same period in 2009.  Defendant Perik commented on the results, stating, in pertinent part, as follows:

> Our financial performance in the first quarter demonstrates that we are continuing the transformation process for The Princeton Review.  That momentum carried through into April when we successfully issued 16.1 million shares of common stock, raising sufficient proceeds to pay off our bridge facility relating to the Penn Foster acquisition.  The positive impact of these changes in our capital structure provides us with further financial flexibility to execute on our strategies, and to continue improving the growth characteristics of our core test prep and online career educational services businesses.

54.     On June 4, 2010, Defendant Richards, the Company's COO and CFO, resigned from the Company, effective as of June 30, 2010.  On June 7, 2010, the Company announced that Defendant Richards resigned and that he was being replaced by Christian G. Kasper ("Kasper"), effective August 16, 2010.

55.     On August 5, 2010, Princeton Review issued a press release announcing its financial results for the second quarter of 2010.  For the quarter, Princeton Review announced that total revenue increased 79% to $56.2 million, up from $31.5 million reported in the same period in 2009. Defendant Perik commented on the results, stating, in pertinent part, as follows:

> Our test prep business has improved and Penn Foster continues to steadily grow, demonstrating the strength of our core businesses.  On the test prep side, our 55% growth in the institutional channel has begun to validate the opportunity for our company to reach a differentiated customer segment.  Increasing Federal money for college readiness programs underscores the opportunity within this market segment.

> The integration of the Penn Foster business is tracking well, and we have achieved approximately $3 million in cost savings based upon actions taken to date.  We expect the integration and restructuring to eventually achieve cost savings in the $4-$6 million range on a run-rate basis.

> Our new business ventures in post secondary education with the AFL-CIO and Massachusetts community colleges continue to progress.  This week, for instance, we are launching our first statewide marketing relationship with the Rhode Island Institute of Labor Studies and Research that will offer more than 25 of our certificate and associate degree programs starting this fall.  At Bristol Community College in southern Massachusetts, our allied health care programs have begun their first enrollments for three degree programs commencing in October.  It's exciting to see

these initiatives begin to take in enrollments, bringing affordable and accessible
education to America's working families.

56.     On November 5, 2010, Princeton Review issued a press release announcing its

financial results for the third quarter of 2010.  For the quarter, Princeton Review announced that total

revenue increased 59% to $54.4 million, up from $34.3 million in the same period in 2009 and that

the increase was attributable to $23.4 million in revenues generated by the company's Penn Foster

division acquired in December 2009.  The Company reported adjusted net income and earnings per

share below consensus estimates from analysts by 86.2% and 38.2%, respectively.  Defendant Perik

commented on the results, stating, in pertinent part, as follows:

> Our results in the third quarter reflected a more cost-conscious retail test prep
> customer, but it was also a period of pursuing new and greater opportunities in other
> market segments, including online, institutional, and our Community College
> Partnerships.  We believe these efforts will result in greater, more predictable and
> profitable revenues as these plans come to fruition.

57.     In response to the Company's announcements on November 5, 2010, Princeton

Review's stock price declined 8.82% to close at $1.55 per share and then dropped another 23.23%

the next trading day, November 8, 2010, to close at $1.19 per share on extremely heavy volume.

58.     On March 8, 2011, Defendant Perik informed the Company of his resignation as a

director and officer of the Company, effective immediately.  That same day, the Company's Board

appointed John M. Connolly ("Connolly") as Interim President and CEO, effective immediately.

The Company then commenced an executive search for a permanent replacement.

59.     On March 9, 2011, the Company announced that Defendant Perik resigned and that

the Board appointed Connolly as Interim President and CEO.  That same day, Princeton Review

issued a press release announcing its financial results for the fourth quarter and full year 2010.  For

the full year 2010, loss from continuing operations was $50.4 million, compared to a loss of

$13.9 million in 2009.

60.     The statements referenced above in ¶¶23-45 were each inaccurate statements of material fact or were materially false and misleading when made because they failed to disclose and misrepresented the following material adverse facts, which were known to Defendants or recklessly or negligently disregarded by them:

(a)     the Company's revenues and earnings were negatively impacted by increased competition in its marketplace, including from companies with lower cost offerings;

(b)     a number of significant operational problems existed at the Company that negatively impacted its business;

(c)     the Company had shifted its focus, and a significant amount of resources, away from its core higher education readiness and Penn Foster core businesses in pursuit of unproven projects to the detriment of its business, financial performance and prospects;

(d)     contrary to the Company's public statements, the Company was not executing well on its turn-around plan;

(e)     the Company encountered significant problems in the higher education readiness business due to a product mix shift and increased competition; and

(f)     as a result of the foregoing, Defendants' positive statements about the Company were lacking in a reasonable basis of fact and were materially false and misleading when made.

61.     On March 10, 2011, Princeton Review held a conference call with investors and analysts to discuss the earnings announcement for the period ended December 31, 2010 and the Company's operations and prospects.  Kasper and Connolly led the conference call.  Connolly made the following statements, among others:

> There is a clear path forward that we will communicate to our shareholders, and we're very excited about our prospects.  During my time as Interim CEO, my focus

will be on the following four areas – one, addressing a number of strategic and operational issues across the Company; two, prioritizing our efforts in addressing the market opportunities in our core Higher Ed Readiness and Penn Foster businesses; three, clearly communicating to our shareholders our direction and our priorities and where we see growth originating and how investors can measure this growth moving forward; and lastly, leading the search for a permanent President and CEO in the months ahead.

\*        \*        \*

Beginning with the higher education readiness business, a product mix shift in this segment, along with the dynamic competitive marketplace, made for a very challenging year in 2010. Despite this year of transition, we continue with our repositioning of this business.

\*        \*        \*

However, our path forward is clear. We will return to our roots as a differentiated branded player at a premium price point, leveraging our strengths in quality teaching, tangible results and experience. And let me note, we will be much more aggressive in how we sell our value proposition into this marketplace.

\*        \*        \*

And lastly, (technical difficulty) if we look at the world, the world has been moving very much to online activities across so many different areas. And one of the things that we are going to be doing a lot around here is how do we build out that capability, how do we leverage new solutions, how do we attack the institutional marketplace, how do we go into new markets domestically, and the list goes on.

62.     On the conference call, Kasper discussed a major reason for the decrease in the Company's revenues and stated, in pertinent part, as follows:

Despite over a 4% increase in total course enrollments, revenues were down as customers opted for lower-priced product offerings. We expect this trend to diminish in 2011 as we anniversary the introduction of our lower-priced SAT course offering first introduced in November 2009 and as we reduce our emphasis on discounting practices.

63.     Following the Company's announcements on March 9 and 10, 2011, the price of Princeton Review stock declined 37.80% to $0.51 per share on March 10, 2011 and then declined another 23.53% on March 11, 2011, to close at $0.39 per share on very heavy volume.

64.     On April 1, 2011, the Company announced that on March 29, 2011, Princeton Review received a deficiency letter from the NASDAQ stating that, based on the closing bid price of the Company's listed securities for the last 30 consecutive business days, the Company no longer meets the minimum $1.00 per share requirement for continued listing on NASDAQ under Marketplace Rule 5450(a)(1). Under Marketplace Rule 5810(c)(3)(A), the Company has a grace period of 180 calendar days, or until September 26, 2011, in which to regain compliance with the minimum bid price rule.

## COUNT I

### Violation of Section 11 of the Securities Act
### Against Princeton Review, Roth Capital and the Offering Individual Defendants

65.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

66.     This Count is brought pursuant to Section 11 of the Securities Act, 15 U.S.C. §77k, and is asserted against Princeton Review, Roth Capital and the Offering Individual Defendants.

67.     The Registration Statement for the Offering was inaccurate and misleading, contained untrue statements of material facts, omitted facts necessary to make the statements made therein not misleading, and omitted to state material facts required to be stated therein.

68.     Princeton Review is the registrant for the Offering. As issuer of the shares, Princeton Review is strictly liable for the materially inaccurate statements contained in the Registration Statement and Prospectus and the failure of the Registration Statement and Prospectus to be complete and accurate.

69.     The Offering Individual Defendants each signed the Registration Statement either personally or through an Attorney-in-Fact and/or caused its issuance. The Offering Individual Defendants each had a duty to make a reasonable and diligent investigation of the truthfulness and

accuracy of the statements contained in the Registration Statement.  They had a duty to ensure that such statements were true and accurate, that there were no omissions of material fact that would make the statements misleading and that the documents contained all facts required to be stated therein.  In the exercise of reasonable care, the Offering Individual Defendants should have known of the material misstatements and omissions contained in the Registration Statement and also should have known of the omissions of material fact that were necessary to make the statements made therein not misleading.  As such, the Offering Individual Defendants are liable to Plaintiff and the Class.

70.     Defendant Roth Capital, as underwriter, was required to investigate with due diligence the representations contained in the Registration Statement to confirm that they did not contain materially misleading statements or omit material facts.  Roth Capital did not make a reasonable investigation or possess reasonable grounds for the belief that the statements described herein, which were contained in the Registration Statement and Prospectus, were true, were without omission of any material facts, and/or were not misleading.

71.     By reasons of the conduct herein alleged, each Defendant named in this Count violated Section 11 of the Securities Act.

72.     Plaintiff and putative Class members acquired Princeton Review common stock in the Offering and in reliance on the Registration Statement and without knowledge of the untruths and/or omissions alleged herein.  Plaintiff and the Class sustained damages when the price of Princeton Review common stock declined substantially subsequent to and due to Defendants' violations.

## COUNT II

### Violation of Section 12(a)(2) of the Securities Act
### Against Princeton Review, Roth Capital and the Offering Individual Defendants

73.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

74.     This Count is brought pursuant to Section 12(a)(2) of the Securities Act, 15 U.S.C. §77l, on behalf of Plaintiff and the Class, against Princeton Review, Roth Capital and the Offering Individual Defendants (the "Count II Defendants").

75.     The Count II Defendants were sellers and offerors and/or solicitors of purchasers of the common stock offered pursuant to the Prospectus for the Offering.  The Count II Defendants issued, caused to be issued, and/or signed the Registration Statement in connection with the Offering.  The Registration Statement contained a Prospectus which was used to induce investors, such as Plaintiff and the other members of the Class, to purchase Princeton Review common stock.

76.     The Prospectus contained untrue statements of material fact, omitted to state other facts necessary to make the statements made not misleading, and omitted material facts required to be stated therein.  The Offering Individual Defendants' actions of solicitation included participating in the preparation of the false and misleading Prospectus and in "Road Shows" to promote the Offering.  Princeton Review and Roth Capital, acting through their employees, agents and others, solicited such purchases for their personal financial gain through the preparation and dissemination of the Prospectus.

77.     Roth Capital participated in the preparation and dissemination of the false and misleading Prospectus for its own financial benefit.  But for its participation in the Offering, including its solicitation as set forth herein, the Offering could not and would not have been accomplished.  Specifically, Roth Capital:

(a)      made the decision to conduct the Offering at the price set forth in the offering documents.  Roth Capital drafted, revised and/or approved the Prospectus.  The Prospectus was calculated to create interest in Princeton Review common stock and was widely distributed by or on behalf of these Defendants for that purpose;

(b)      finalized the Prospectus and caused it to become effective; and

(c)      conceived and planned the Offering and orchestrated all activities necessary to affect the sale of this common stock to the investing public, by issuing common stock, promoting the common stock and supervising its distribution and ultimate sale to the investing public.

78.      As set forth more specifically above, the Prospectus contained untrue statements of material fact and omitted to state material facts necessary in order to make the statements, in light of the circumstances in which they were made, not misleading.

79.      Plaintiff and the other Class members did not know, nor could they have known, of the untruths or omissions contained in the Prospectus.

80.      The Defendants named in this Count were obligated to make a reasonable and diligent investigation of the statements contained in the Prospectus to ensure that such statements were true and that there was no omission of material fact required to be stated in order to make the statements contained therein not misleading.  None of the Defendants named in this Count made a reasonable investigation or possessed reasonable grounds for the belief that the statements contained in the Prospectus were accurate and complete in all material respects.  Had they done so, these Defendants would have known of the material misstatements and omissions alleged herein.

81.      By reason of the conduct alleged herein, these Defendants violated Section 12(a)(2) of the Securities Act.  Accordingly, Plaintiff and members of the Class who hold Princeton Review common stock purchased in the Offering have the right to rescind and recover the consideration paid

for their Princeton Review common stock and hereby elect to rescind and tender their Princeton Review common stock to the Defendants sued herein.  Plaintiff and Class members who have sold their Princeton Review common stock are entitled to rescissory damages.

## COUNT III

### Violation of Section 15 of the Securities Act
### Against the Offering Individual Defendants

82.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

83.     This Count is brought pursuant to Section 15 of the Securities Act against the Offering Individual Defendants.

84.     Each of the Offering Individual Defendants acted as controlling persons of Princeton Review within the meaning of Section 15 of the Securities Act by virtue of his position as a director and/or senior officer of Princeton Review.  By reason of their senior management positions and/or directorships at the Company, as alleged above, these Offering Individual Defendants, individually and acting pursuant to a common plan, had the power to influence and exercised the same to cause Princeton Review to engage in the conduct complained of herein.  By reason of such conduct, the Offering Individual Defendants are liable pursuant to Section 15 of the Securities Act.

85.     Each of the Offering Individual Defendants was a culpable participant in the violations of Sections 11 and 12(a)(2) of the Securities Act alleged in Counts I and II above, based on their having signed the Registration Statement and having otherwise participated in the process which allowed the Offering to be successfully completed.

## COUNT IV

### Violation of Section 10(b) of the Exchange Act
### and Rule 10b-5 Promulgated Thereunder
### Against Defendants Princeton Review, Perik, Richards, Kasper, and Rao

86.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

87.     This Count is alleged against Defendants Princeton Review, Perik, Richards, Kasper, and Rao (the "Count IV Defendants").

88.     During the Class Period, the Count IV Defendants disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

89.     The Count IV Defendants violated Section 10(b) of the Exchange Act and Rule 10b-5 in that they: (a) employed devices, schemes, and artifices to defraud; (b) made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; or (c) engaged in acts, practices, and a course of business that operated as a fraud or deceit upon Plaintiff and others similarly situated in connection with their purchases of Princeton Review common stock during the Class Period.

90.     As alleged herein, the Count IV Defendants acted with scienter in that these Defendants knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the federal securities laws.  As set forth elsewhere herein in detail, the Count IV Defendants, by

virtue of their receipt of information reflecting the true facts regarding Princeton Review, their control over, and/or receipt and/or modification of Princeton Review's allegedly materially misleading misstatements and/or their associations with the Company which made them privy to confidential proprietary information concerning Princeton Review, participated in the fraudulent scheme alleged herein.

91.     At all relevant times, the market for Princeton Review common stock was an efficient market for the following reasons, among others:

(a)     Princeton Review common stock met the requirements for listing, and was listed and actively traded on the NASDAQ, a highly efficient and automated market;

(b)     as a regulated issuer, Princeton Review filed periodic public reports with the SEC and the NASDAQ;

(c)     Princeton Review regularly communicated with public investors via established market communication mechanisms, including through regular disseminations of press releases on the national circuits of major newswire services and through other wide-ranging public disclosures, such as communications with the financial press and other similar reporting services; and

(d)     Princeton Review was followed by several securities analysts employed by major brokerage firms who wrote reports which were distributed to the sales force and certain customers of their respective brokerage firms.  Each of these reports was publicly available and entered the public marketplace.

92.     As a result of the foregoing, the market for Princeton Review common stock promptly digested current information regarding Princeton Review from all publicly-available sources and reflected such information in the price of Princeton Review common stock.  Under these

circumstances, all purchasers of Princeton Review common stock during the Class Period suffered similar injury through their purchase of Princeton Review common stock at artificially inflated prices and a presumption of reliance applies.

93.     The statutory safe harbor provided for forward-looking statements under certain circumstances does not apply to any of the allegedly false statements pleaded in this Complaint. Many of the specific statements pleaded herein were not identified as "forward-looking statements" when made.  To the extent there were any forward-looking statements, there were no meaningful cautionary statements identifying important factors that could cause actual results to differ materially from those in the purportedly forward-looking statements.  Alternatively, to the extent that the statutory safe harbor does apply to any forward-looking statements pleaded herein, the Count IV Defendants are liable for those false forward-looking statements because at the time each of those forward-looking statements was made, the particular speaker knew that the particular forward-looking statement was false, and/or the forward-looking statement was authorized and/or approved by an executive officer of Princeton Review who knew that those statements were false when made.

94.     Plaintiff and the Class have suffered damages in that, in reliance on the integrity of the market, they paid artificially inflated prices for Princeton Review common stock.  Plaintiff and the Class would not have purchased Princeton Review stock at the prices they paid, or at all, if they had been aware that the market prices had been artificially and falsely inflated by Defendants' misleading statements.

95.     As a direct and proximate result of these Defendants' wrongful conduct, Plaintiff and the other members of the Class suffered damages in connection with their purchases of Princeton Review common stock during the Class Period.

- 28 -

## COUNT V

### Violation of Section 20(a) of the Exchange Act
### Against Defendants Perik, Richards, Kasper, and Rao

96.     Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

97.     This Count is alleged against Defendants Perik, Richards, Kasper, and Rao (the "Count V Defendants").

98.     The Count V Defendants acted as controlling persons of Princeton Review within the meaning of Section 20(a) of the Exchange Act.  By reason of their positions as officers and/or directors of Princeton Review, and their ownership of Princeton Review stock, the Count V Defendants had the power and authority to cause Princeton Review to engage in the wrongful conduct complained of herein.  The Count V Defendants controlled Princeton Review and all of its employees.  By reason of such conduct, the Count V Defendants are liable pursuant to Section 20(a) of the Exchange Act.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiff, on behalf of itself and the Class, prays for judgment as follows:

A.     declaring this action to be a class action properly maintained pursuant to Rules 23(a) and (b)(3) of the Federal Rules of Civil Procedure;

B.     awarding Plaintiff and other members of the Class damages together with interest thereon;

C.     with respect to Count II, Ordering that the Offering be rescinded;

D.     awarding Plaintiff and other members of the Class their costs and expenses of this litigation, including reasonable attorneys' fees, accountants' fees and experts' fees and other costs and disbursements; and

E.     awarding Plaintiff and other members of the Class such other and further relief as

may be just and proper under the circumstances.

**JURY DEMAND**

Plaintiff demands a trial by jury.

DATED:  July 29, 2011    HUTCHINGS, BARSAMIAN, MANDELCORN
          & ZEYTOONIAN, LLP
        THEODORE M. HESS-MAHAN


          /s/Theodore M. Hess-Mahan
        THEODORE M. HESS-MAHAN, BBO #557109

        110 Cedar Street
        Wellesley Hills, MA  02481
        Telephone:  781/431-2231
        781/431-8726 (fax)
        thess-mahan@hutchingsbarsamian.com

        ROBBINS GELLER RUDMAN
         & DOWD LLP
        SAMUEL H. RUDMAN
        EVAN J. KAUFMAN
        58 South Service Road, Suite 200
        Melville, NY  11747
        Telephone:  631/367-7100
        631/367-1173 (fax)
        srudman@rgrdlaw.com
        ekaufman@rgrdlaw.com

        VANOVERBEKE MICHAUD &
         TIMMONY, P.C.
        MICHAEL J. VANOVERBEKE
        THOMAS C. MICHAUD
        79 Alfred Street
        Detroit, MI  48201
        Telephone:  313/578-1200
        313/578-1201 (fax)
        mvanoverbeke@vmtlaw.com
        tmichaud@vmtlaw.com

        *Attorneys for Plaintiff*

I:\Princeton Review\Pleadings\Princeton CPT.doc