UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

CIVIL ACTION NO. 11-11359-RGS

WASHTENAW COUNTY EMPLOYEES' RETIREMENT SYSTEM,
on Behalf of Itself and All Others Similarly Situated

v.

THE PRINCETON REVIEW, INC., MICHAEL PERIK, STEPHEN C.
RICHARDS, SUSAN RAO, DAVID LOWENSTEIN, JEFFREY R. CRISAN,
ROBERT E. EVANSON, CHRISTIAN G. KASPER, RICHARD KATZMAN,
MICHAEL A. KRUPKA, LINDA WHITLOCK, and ROTH CAPITAL
PARTNERS, LLC

MEMORANDUM AND ORDER ON
DEFENDANTS' MOTIONS TO DISMISS
THE AMENDED COMPLAINT

March 6, 2012

STEARNS, D.J.

This federal securities class action was brought on behalf of purchasers of

common stock of The Princeton Review, Inc. (TPR), in or traceable to TPR's offering

of securities on April 15, 2010 (the Offering) under sections 11, 12(a)(2), and 15 of the

Securities Act of 1933.  TPR, the individual defendants,[1] and Roth Capital Partners,

---

[1] At times relevant to this action, Stephen C. Richards was TPR's COO and
CFO; Christian G. Kasper was also TPR's COO and CFO; Susan Rao was TPR's
Executive Vice President of Finance, and Treasurer; and David Lowenstein, Jeffrey R.
Crisan, Robert E. Evanson, Richard Katzman, Michael A. Krupka, and Linda Whitlock
served as directors.  Am. Compl. ¶¶ 9-17, 73.

LLC (Roth Capital), have moved to dismiss the Amended Complaint filed by lead plaintiff Washtenaw County Employees' Retirement System (WCERS) for failure to state a claim upon which relief can be granted pursuant to Fed. R. Civ. P. 12(b)(6).[2] For the reasons to be stated, defendants' motion to dismiss will be granted.

**Background**

TPR was founded in 1981 to provide classroom-based and online test preparation courses for post-secondary and graduate admissions tests. Am. Compl. ¶ 26. At the time of the Offering, TPR operated through three divisions: (1) the Test Preparation Services division ("Test Prep"), which provided live and online test preparation courses, as well as individual and small group tutoring; (2) the Penn Foster division, acquired in December of 2009, which provided accredited, career-focused online degree and vocational programs; and (3) the Supplemental Educational Services ("SES") division, which provided tutoring and other services under the No Child Left Behind Act of 2001. *See id.* ¶¶ 27-30. TPR's competitors in the Test Prep market were (and are) Kaplan, Revolution Prep, and other local providers. *Id.* ¶ 62,

By 2007, TPR's business was anemic. *Id.* ¶ 33. TPR was facing high costs and shrinking gross margins, falling from 71% in 2003 to less than 64% by 2007. *Id.*

---

[2] Roth Capital filed a separate motion to dismiss, but relies on the same grounds stated in the memorandum of law filed by TPR and the individual defendants.

Michael Perik was hired as CEO to restructure and rescue the ailing company. *Id.* ¶¶ 34-35. The restructuring and turn-around plan was to be implemented in two phases. *Id*. ¶ 35. The first phase would focus on cutting costs, reducing and rationalizing staffing, and taking TPR back to its core competencies (Test Prep and SES), in an effort to lift profit margins. *Id.* The second phase would be dedicated to growth – TPR would leverage acquired franchises, develop new products related to core offerings, enter new markets, and build a compelling online product offering. *Id.* ¶ 36. By early 2009, TPR was poised to enter the growth phase of the turn-around plan. *Id.*

In 2009, TPR's financial results reflected an improved all-around performance. In March of 2009, for the year ending December 31, 2008, TPR reported a net profit from continuing operations of $1.3 million, up from a loss of $31.4 million in 2007, with an increase in gross revenues of 25.5% over 2007 to $138.8 million. *Id.* ¶ 38. In May of 2009, TPR reported that first quarter revenues had increased 25.5% to $44.8 million from $35.7 million during the same period in 2008, with a net profit from continuing operations of $2.2 million as compared to $0.3 million during the same period in 2008. *Id.* ¶ 41. In August of 2009, for the first six months of 2009, TPR reported a 9.3% increase in gross revenues to $76.3 million as compared to $69.8 million for the same period in 2008. *Id.* ¶ 44. In November of 2009, for the third quarter, TPR reported gross revenues of $34.3 million as compared to $34.7 million for

the same period in 2008. *Id.* ¶ 49. TPR released its full year 2009 results in March of 2010, reporting that its revenue increased 3.4% over 2008, to $143.5 million as compared to $138.8 million. *Id.* ¶ 52. In press releases and earnings calls in 2009 and early 2010 (prior to the Offering), Perik touted the success of TPR's turn-around effort, and TPR's optimistic outlook over its position in the Test Prep marketplace. *See id.* ¶¶ 38-39, 41-42, 44-45, 49-54.

On September 24, 2009, TPR filed a Registration Statement with the SEC for an Offering of up to $75 million of securities. *Id.* ¶ 31. On October 19, 2009, TPR announced the $170 million cash acquisition of Penn Foster. *Id*. ¶ 48. In January of 2010, TPR announced that it had partnered with the National Labor College to provide career development courses to AFL-CIO members and their families. *Id.* ¶ 63. In March of 2010, TPR announced a joint venture with Bristol Community College to create an Allied Health Care Initiative with a degree program in health science, medical information coding, and other medical areas. *Id*.

On April 15, 2010, TPR issued 14 million shares of common stock at $3 a share. *Id.* ¶ 32. The Offering was made pursuant to the September 24, 2009 Registration statement and a Prospectus and Prospectus Supplement filed with the SEC on April 15, 2011 (collectively the Offering Materials). *Id.* ¶¶ 31-32. The Offering Materials incorporated specific SEC filings by reference, including TPR's Annual Reports on

Form 10-K for 2009 and 2008; TPR's Quarterly Reports on Form 10-Q for the periods ending in March 31, 2009, and June 30, 2009; and TPR's Current Reports on Form 8-K filed on March 18, 2009, March 31, 2009, April 20, 2009, and the Amended Current Report on Form 8K/A filed on March 30, 2009. Roth Capital served as the underwriter for the Offering, and exercised the overallotment option to purchase an additional 2.1 million shares. *Id.* ¶¶ 19, 32. In total, TPR sold 16.10 million shares, and raised $48.3 million. *Id.* ¶ 32.

Following the Offering, for the first quarter of 2010, TPR reported a 2% decline in Test Prep revenue. *See* TPR 5/7/10 Form 10-Q at 18. For the second quarter of 2010, TPR announced an increase of Test Prep revenue by $1.4 million, or 5%, over the same period in 2009. *See* TPR 8/6/2010 Form10-Q at 22. The price of TPR stock gradually declined from the date of the Offering, from $3.42 a share on April 15, 2010, to $1.70 a share on November 4, 2011.

On November 5, 2010, TPR announced financial results for the third quarter of 2010 that fell below Wall Street expectations. Am. Compl. ¶ 74. TPR reported total revenues of $54.4 million compared with estimates of $63.5 million (14.3% below the forecast), an adjusted net loss of $8.83 million compared with a projected loss of $4.48 million (86.2% below estimates), and adjusted losses of $0.17 per share compared with an expected loss of $0.12 per share (38.2% below estimates). *Id.* Kasper, who had

replaced Richards as TPR's COO and CFO in June of 2010, explained in an earnings call that TPR's lower performance was "primarily due to a $2.6 million or 13% decrease in retail test prep revenue . . . [which] was primarily due to customers opting for our lower price SAT prep offerings, partially offset by increased enrollment."  *Id.* ¶ 75.  During the same call, CEO Perik agreed that the lower performance was attributable to "customers choosing cheaper offerings."  *Id.* ¶ 76.

As a result of the reported financial results, TPR's stock fell 8.82% to close at $1.55 a share.  *Id.* ¶ 77.  It fell another 23.23% on the next trading day (November 8, 2010) to close at $1.19 a share.  *Id.*  By March 8, 2011, TPR stock had fallen to $0.87 a share.

Perik resigned on March 8, 2011, and John M. Connolly was appointed Interim President and CEO.  *Id.* ¶ 79.  The following day, TPR released its year-end results for 2010, which showed a loss from continuing operations of $50.4 million, compared to a loss of $13.9 million in 2009, and lower than expected gross revenues, particularly in Test Prep.  *Id.* ¶ 80.  During an associated earnings call, Connolly cited "the product mix shift" and "the dynamic competitive marketplace" as the primary reasons for disappointing Test Prep results in 2010 .  *Id.* ¶ 81.  COO Kasper also repeated the explanation that Test Prep revenues had diminished despite increased enrollments because "customers opted for lower-priced product offerings."  *Id.* ¶ 82.  Following

publication of the year-end results, TPR's stock fell 37.80% to $0.51 a share on March 10, 2011, and by another 25.53% to $0.39 a share on March 11.  *Id.* ¶ 83.

WCERS filed this lawsuit on July 29, 2011.  WCERS alleges that the Offering Materials misrepresented or failed to disclose five categories of then-existing material adverse facts:

> (a) Princeton Review was not executing well on the growth phase of its turnaround plan;
>
> (b) the Test Prep business was in decline and there was a major shift by customers away from more expensive to less expensive product offerings;
>
> (c) increases in the number of enrollments were not sufficient to counter the major shift by customers into less expensive offerings;
>
> (d) the Company's revenues and earnings were negatively impacted by increased competition in its marketplace, including from companies with lower cost offerings; [and]
>
> (e) Princeton Review's management neglected to improve the Company's core Test Prep and Penn Foster businesses in pursuit of unproven side projects to the detriment of its business, financial performance and prospects.

*Id.* ¶ 65.  WCERS also alleges that because student-consumers make enrollment decisions months in advance, at the time of the Offering TPR knew the impact that a shift in product choices would have on its third quarter of 2010 Test Prep revenues, *id.* ¶¶ 59-61, but "failed to warn investors that, at the time of the Offering, . . . revenues

for Test Prep would be lower during the third quarter of 2010 and beyond than previously forecasted." *Id.* ¶ 72.

Defendants have moved to dismiss WCERS's Amended Complaint, arguing that TPR either did not have a duty to disclose the alleged misleading or omitted facts, or that the facts were sufficiently disclosed in the Offering Materials. Defendants also maintain that WCERS cannot show loss causation.[3] The court heard oral argument on February 22, 2012.

**Discussion**

To survive a motion to dismiss pursuant to Rule 12(b)(6), the factual allegations of the complaint must "possess enough heft" to set forth "a plausible entitlement to relief." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557, 559 (2007); *Thomas v. Rhode Island*, 542 F.3d 944, 948 (1st Cir. 2008). As the Supreme Court has emphasized, this standard "demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation. A pleading that offers labels and conclusions or a formulaic recitation of the elements of a cause of action will not do. Nor does a complaint suffice if it tenders naked assertion[s] devoid of further factual enhancement." *Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1949 (2009) (internal citations and quotation marks omitted).

---

[3] TPR and the individual defendants make the separate argument that they are not "sellers" under section 12(a)(2) of the Securities Act of 1933.

Sections 11, 12(a)(2), and 15 of the Securities Act of 1933 impose liability for material misrepresentations or omissions in a registration statement related to a security offering.  Section 11 provides that every signer, director, and underwriter may be held liable for a registration statement which "includes untrue statements of material facts or fails to state material facts necessary to make the statements therein not misleading." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 208 (1976).  To survive a motion to dismiss the section 11 claim, WCERS must successfully allege "(1) that [TPR's] prospectus contained an omission [or misrepresentation]; (2) that the omission [or misrepresentation] was material; (3) that defendants were under a duty to disclose the omitted information; and (4) that such omitted information existed at the time the prospectus became effective." *Cooperman v. Individual, Inc.*, 171 F.3d 43, 47 (1st Cir. 1999).

Section 12(a)(2) provides that any person who "offers or sells" a security by means of a prospectus or oral communication containing a materially false statement or that "omits to state a material fact necessary in order to make the statements, in the light of the circumstances under which they were made, not misleading," shall be liable to any "person purchasing such security from him." 15 U.S.C. § 77*l*(a)(2).  Section 15 of the Act provides for the joint and several liability of persons who "control" those who have committed a primary violation of section 11 or section 12.  15 U.S.C. § 77o.

The parties agree that only statements or omissions in TPR's Offering Materials and the documents that they incorporate by reference are actionable under sections 11 and 12(a)(2).[4]  *See* 15 U.S.C. § 77k(a); *In re Bank of Boston Corp. Sec. Litig.*, 762 F. Supp. 1525, 1538-1539 (D. Mass. 1991).  WCERS has identified the five previously listed categories of allegedly actionable statements or omissions in TPR's Offering Materials.  I will address each category in its logical progression.

### *TPR's Failure to Forewarn of Q3 2010 Results Based on Advanced Bookings*

This dispute is not over the materiality of the omitted information, but over the duty to disclose it.  Defendants argue that TPR's alleged failure to warn investors about lower third quarter of 2010 Test Prep revenues is not an actionable omission because "federal securities laws impose no obligation upon an issuer to disclose forward-looking information such as internal projections, estimates of future performance, forecasts, budgets, and similar data."  *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1209 (1st Cir. 1996).  WCERS maintains that TPR had a duty to disclose the omitted information because the advanced bookings were tangible information that TPR possessed at the time of the Offering, and therefore subject to disclosure under Items

---

[4] Although section 12(a)(2) refers to "oral communications," these are limited to oral communications concerning a prospectus. *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 567-568 (1995).  WCERS has not alleged any actionable oral communications.

303 and 503 of Form 3-S, the Registration Statement form.[5]

Defendants, however, are correct that TPR was not obligated to disclose its internally-tracked advanced booking information. "'[T]he mere possession of material nonpublic information does not create a duty to disclose it.'" *Cooperman*, 171 F.3d at 47, quoting *Shaw*, 82 F.3d at 1202. "The issue, rather, is whether the securities law imposes on defendants a 'specific obligation' to disclose the information of the type that plaintiffs claim was omitted." *Cooperman*, 171 F.3d at 49-50. There is only a duty to disclose if (i) a statute or regulation requires it, or (ii) a company has made inaccurate, incomplete or misleading prior disclosures. *See id.* at 50.

WCERS has not alleged any inaccurate, incomplete, or misleading disclosures in the Offering Materials regarding TPR's performance in the third quarter of 2010. Indeed, the Offering Materials disclosed that TPR's business was subject to seasonal fluctuations, and that "quarterly operational results are not indicative of future

---

[5] Item 303(a) requires disclosure of "any and all material changes . . . which have occurred since the end of the latest fiscal year . . . and which have not been described in a report on Form 10-Q or Form 10-K." Instructions to Form S-3. This in turn has been interpreted by the SEC to mean that a "disclosure duty exists where a trend, demand, commitment, event or uncertainty is both presently known to management and reasonably likely to have material effects on the registrant's financial condition or results of operation." *Mgmt.'s Discussion and Analysis of Fin. Condition and Results of Operations; Certain Inv. Co. Disclosures*, S.E.C. Release No. 6835, 1989 WL 1092885, at *4 (May 18, 1989). Item 503 of Form S-3 further requires a "discussion of the most significant factors that make the offering risky or speculative." 17 C.F.R. § 229.503.

performance and are difficult to forecast" because of, inter alia, customers' spending patterns and variations in product mix.  TPR 3/15/10 Form 10-K at 19.

Moreover, the statutes and regulations did not impose a duty on TPR to disclose its advanced bookings at the time of the Offering.  "[F]ederal securities laws focus on the mandatory disclosure of backward-looking hard information, not forecasts." *Glassman v. Computervision Corp.*, 90 F.3d 617, 631 (1st Cir. 1996).  In *Glassman,* the Court affirmed the district court's denial of a motion to file a second amended complaint for failure to state claims under sections 11, 12(a)(2), and 15, which satisfied Rule 12(b)(6) pleading standards.  *Id*. at 623.  In so holding, the Court found that Computervision did not have a duty to disclose that its internally-tracked software sale bookings, seven weeks into the then-in-progress quarter, amounted to only 24% of the company's internal forecasts for those weeks and were significantly lower than the bookings at comparable points in the five previous quarters.  *Id*. at 630-632.  The Court rejected an argument that Computervision had a duty, under Item 303, to disclose the then-existing hard information of its internal domestic bookings because such information was "not particularly predictive," and was "remote in time and causation from the ultimate event of which it supposedly forewarns."  *Id.* at 632.

In the instant case, the omitted information was even more remote, whether measured in time or causation, from the ultimately disappointing third quarter results

than were the seven-week bookings in *Glassman*.  The Offering took place on April 15, 2010, four and one-half months before the third quarter started, and even more months before the financial results of the third quarter would become finalized.  Indeed, at the time of the Offering, even the first quarter of 2010 results were not yet known.  Given the extended period of time – seven months – between the Offering and the final recognition of the complained-of third quarter results, "a nondisclosure claim becomes 'indistinguishable from a claim that the issuer should have divulged its internal predictions about what would come of the undisclosed information.'" *Id.*, quoting *Shaw*, 82 F.3d at 1210.

Moreover, WCERS has not alleged that TPR possessed hard information that would guarantee a disappointing third quarter.  That TPR's third quarter of 2010 results disappointed does not support the inference that TPR had hard information at the time of the Offering – seven months prior – that would have predicted a material departure from a result based on known trends and risks.  *See Glassman*, 90 F.3d at 632 ("That quarterly results for the third quarter of 1992 did in fact turn out to be lower than expected is not enough to produce the inference that as of the offering date Computervision had hard mid-quarter results that would have predicted a material departure in the end-of-quarter results.").

Finally, the decline in Test Prep revenues in the third quarter of 2010 was

primarily attributable to a shift in customer purchasing preferences from higher- to lower-priced products, a shift that was not fully offset by increased enrollment. This particular trend and risk (as discussed below) was adequately disclosed in the Offering Materials, as were the seasonal revenue fluctuations and inherent difficulties in forecasting future performance. Therefore, third quarter of 2010 results cannot be said to have significantly departed from known trends and risks such that TPR would have had a duty to prematurely disclose an unfavorable forecast. Because TPR had no duty to disclose its internally-tracked advanced bookings for the third quarter of 2010 at the time of the Offering, the omission of this information is not actionable under sections 11 and 12(a)(2), and therefore not actionable under section 15.

### *Customers' Shift from Higher- to Lower-Priced Offerings Not Fully Offset by Increased Enrollment*

Defendants do not challenge the materiality of this information or that TPR had a duty to disclose it. Rather, defendants argue that the Offering Materials disclosed the allegedly omitted information. Defendants point to TPR's 3/15/2010 Form 10-K, reporting on TPR's full year 2009 results, which was explicitly incorporated into the Offering Materials by reference.[6] In this Form 10-K, TPR disclosed that the $2 million increase in Test Prep revenues in 2009 was

---

[6] The Prospectus specifically directs the investor to this Form 10-K for a discussion of the risks of investing in TPR. Prospectus at 1.

further offset by a decrease of $6.7 million due primarily to lower classroom-based and tutoring revenues during the year ended December 31, 2009. Increases in classroom-based enrollment were offset by lower prices charged for our classroom-based courses and a higher percentage of enrollments from lower-priced services. Organic tutoring revenues declined due to lower enrollments and a shift toward lower priced tutoring packages. We expect these pricing and enrollment trends to continue through 2010.

TPR 3/15/2010 Form 10-K at 32-33.

WCERS argues that TPR's disclosure misrepresented the negative trends in Test Prep by representing that "the shift of customers to lower priced offerings was offset by increases in total enrollments, such that the increase in enrollments reduced or eliminated the negative impact of the shift towards lower priced services." WCERS Opp'n at 23. This, however, is not a fair reading of the disclosure. Indeed, the disclosure said exactly the opposite – that the positive impact of increased enrollment was offset by the negative impact of the shift in customer preference. In other words, the preference for lower-priced offerings erased the gains from higher enrollments. The reasonable conclusion, then, is that the trend in Test Prep was negative.

WCERS argues that TPR's disclosure was "boilerplate" and insufficient because the disclosure remained the same over the several quarters prior to the Offering despite TPR's "stabilized" results over 2009 and early 2010. At the hearing, WCERS relied on *Slayton v. Am. Express Co.*, 604 F.3d 758 (2d Cir. 2010), in support of its argument. In *Slayton*, the Court held that the cautionary language that "potential deterioration in

15

the high-yield sector . . . could result in further losses in [American Express]'s investment portfolio" was not sufficiently substantive for American Express to avail itself of the safe harbor provision for forward-looking statements under section 27a. *Id*. at 772-773.  In so holding, the Court found that the language at issue was vague, did not warn of the actual risk that actually materialized (rising defaults on the bonds underlying American Express's investment-grade CDOs), and "remained the same even while the problem changed." *Id.*

*Slayton* is inapposite.  Here, TPR's disclosure was specific enough about the negative trends (lower prices, and a customer preference for lower-priced products that was not offset by higher enrollment) to "bespeak caution" to the investor.  *Cf. In re Evergreen Ultra Short Opportunities Fund Sec. Litig.*, 705 F. Supp. 2d 86, 93 (D. Mass. 2010).  TPR's disclosure warned of the *exact* trend that was a primary cause of TPR's disappointing third quarter of 2010 results.[7]

Finally, WCERS argues that the sudden drop in TPR's stock price after the announcement of TPR's third quarter of 2010 results reveals that TPR had not adequately disclosed the negative Test Prep trends to the public.  However, WCERS

---

[7] WCERS argues that the trend could not have been as consistent as TPR claimed in its disclosure because TPR's results showed stabilization and improvement in 2009, and early 2010.  However, short term results do not negate the existence of a deeper trend, as daily weather forecasts do not negate long-term trends in the global climate.

ignores the fact that TPR stock had steadily fallen – from $3.42 on the day of the Offering to $1.70 on the day before the release of the third-quarter results.  That TPR's stock had fallen more than 50% prior to any corrective disclosure from TPR bespeaks of other significant factors that influenced the stock price.  Because TPR adequately disclosed a customer preference for lower-priced products that was not fully offset by increased enrollments, there is no actionable omission or misrepresentation under sections 11, 12(a)(2), or 15.

### *Negative Impact on Revenues from Intense Competition in the Market*

Defendants assert that this is another category of information that is fully and accurately disclosed in the Offering Materials.  Indeed, TPR specifically disclosed that "[w]e face intense competition that could adversely affect our revenue, profitability and market share."  TPR 3/15/10 Form 10-K at 18.  TPR further disclosed that "[t]he markets for our products and services are highly competitive, and we expect increased competition in the future that could adversely affect our revenue, profitability and market share . . . . We may not be able to maintain our competitive position or otherwise compete effectively with current or future competitors, especially those with significantly greater resources."  *Id.* at 18-19.  TPR also specifically described the competitive landscape for each division of its business, identifying Kaplan and other local and regional companies as its competitors in Test Prep.  *Id.* at 13.

WCERS agrees that TPR adequately disclosed the stiff competition in the marketplace, but argues that

> [t]he issue is not that Defendants hid the existence of competitors and investments in side-projects from investors. Rather, Plaintiff alleges that the Registration Statement failed to disclose that management was *distracted by* these side projects and failed to focus adequate attention on the Company's core business. Further, the Registration Statement failed to disclose that this heavy focus on side-projects negatively impacted the Company's competitive position in the marketplace.

WCERS Opp'n at 19 (emphasis in original).  However, where a defendant like TPR has disclosed the relevant material facts regarding the competition it faces in the marketplace and its "side projects" (see discussion below), there is no requirement that it pejoratively characterize its endeavors "in the bleakest possible terms in order to make its disclosures complete and not misleading."  *In re Stone & Webster, Inc., Sec. Litig.*, 253 F. Supp. 2d 102, 126 (D. Mass. 2003).  Because TPR did not hide and did adequately disclose the existence of and risk from competition in the marketplace, this category of information is not actionable under sections 11, 12(a)(2), or 15.

### *TPR's Management was Distracted by the Pursuit of Side Projects*

Defendants assert that this is another category of information where TPR fully disclosed the relevant material facts.  Defendants point to the Offering Materials in which TPR discussed its strategy to diversify its business beyond Test Prep and disclosed its acquisition of Penn Foster and its partnership with the National Labor

College.[8]  *See* TPR 3/15/2010 Form 10-K at 4.  TPR also disclosed that the risks associated with its diversification strategy included "difficulties in assimilating acquired operations, technologies or products" and "[d]iversion of management attention and transaction cost associated with negotiating and closing the transaction."  *Id.* at 22.

WCERS does not allege that there was any material "side project" that was omitted or misrepresented in the Offering Materials.  As noted above, WCERS argues that the crux of its claim is that TPR's management was distracted by the pursuit of these side projects.  However, where TPR had adequately disclosed these projects and their attendant risks, it had no additional duty to denigrate the ability of its management to oversee its business.  Indeed, "mismanagement" is not a cognizable claim under the securities laws.  *See Santa Fe Indus., Inc. v. Green*, 430 U.S. 462, 479-480 (1977).  Because TPR adequately disclosed its diversification strategy and the attendant risks, this category of information is not actionable under sections 11, 12(a)(b), and 15.

### *TPR was not Executing Well on the Growth Phase of Its Turn-Around Plan*

Defendants assert that this final category of information is yet another instance where TPR adequately disclosed the relevant material facts.  First, defendants note that TPR made no representations as to the turn-around strategy or its execution in the

---

[8] TPR had also publicly disclosed its partnership with the Bristol Community College prior to the Offering, in its 3/11/10 8-K.

Offering Materials.  Second, defendants argue that the Offering Materials provided an accurate and measured view of TPR's performance.  For example, the Offering Materials disclosed that TPR's net loss in 2009 was approximately $12.4 million, as opposed to its net loss of $8.7 million in 2008.  TPR 3/15/2012 Form 10-K at 32. Third, defendants argue that the Offering Materials fully disclosed the risks inherent in TPR's ongoing efforts to improve its performance.  For instance, the Offering Materials disclosed TPR's "history of significant operating losses" and the risk that TPR might "not be able to achieve sustained profitability if [it is] unable to increase revenue from [its] newer products and services and successfully implement a number of new initiatives[.]" *Id.* at 15.  This Risk Factor disclosed that TPR had "incurred net losses of approximately $12.4 million, $8.7 million and $28.7 million for the years ended December 31, 2009, 2008 and 2007, respectively."  *Id.* at 15-16.  TPR also explained that "[i]n order to achieve sustained profitability" it must "continue to implement changes to existing business processes, significantly reduce overhead expense and drive profitable revenue growth." *Id.* at 16.

WCERS has not identified any statements in the Offering Materials regarding TPR's execution of the turn-around strategy that could be characterized as false or misleading.  WCERS also has not alleged that any of the many facts cited by TPR regarding its performance record was misrepresented, or that any particular material

20

fact was omitted from the Offering Materials.  Rather, WCERS bases its claim on numerous statements outside of the Offering Materials in which former CEO Perik expressed optimism regarding TPR's execution of its turn-around strategy.

WCERS does not dispute, however, that liability under sections 11, 12(a)(b) and 15 must be premised upon a material misrepresentation or omission in a registration statement or prospectus, or in the documents they incorporate by reference.  Because WCERS has not identified any material omissions or misrepresentations in the Offering Materials, this category of information is also not actionable under sections 11, 12(a), and 15.  Because I find that WCERS has not alleged any actionable material omissions or misrepresentations in TPR's Offering Materials, there is no need to address defendants' remaining arguments.

## ORDER

For the foregoing reasons, defendants' motions to dismiss are <u>ALLOWED</u> with prejudice.  The Clerk will enter judgment for defendants and close the case.

SO ORDERED.

/s/ Richard G. Stearns
_____
UNITED STATES DISTRICT JUDGE